IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>VETERANS FELLOWSHIP MINISTRIES, INC.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 19-10857 (BLS)<br><br>Hearing Date: April 21, 2020 at 1:00 p.m. (*prevailing* Eastern Time)<br>Objection Deadline: April 14, 2020 at 4:00 p.m. (*prevailing* Eastern Time) |

## DEBTOR'S MOTION FOR AN ORDER CONTINUING THE SCHEDULED PLAN CONFIRMATION HEARING PURSUANT TO SECTIONS 105 AND 1121(e)(3) OF THE BANKRUPTCY CODE

The debtor and debtor in possession in the above-captioned case (the "Debtor") submits this motion (the "Motion"), pursuant to sections 105 and 1121(e)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rule 9006(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order, substantially in the form attached hereto (the "Proposed Order"), continuing the scheduled date for confirmation of the Debtor's Plan which is currently scheduled for April 21, 2020 at 1 p.m. **As a direct result of the COVID 19 pandemic, the Debtor's Plan has become infeasible.** In further support of this Motion, the Debtor respectfully states as follows:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for

---

[1] The Debtor in this case, along with the last four digits of the federal tax identification number, is Veterans Fellowship Ministries, Inc. (4648). The mailing address for the Debtor is 32 Middle Wallop Road, Bear, Delaware 19701.

the District of Delaware, dated July 19, 2019 (the "Amended Standing Order"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 105 and 1121(e)(3) of the Bankruptcy Code, Bankruptcy Rule 9006(b), and Local Rule 9006-2.

## INTRODUCTION

2. On April 16, 2019 ("Petition Date"), the Debtor filed a *pro se* voluntary petition for relief ("Chapter 11 Case") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. No trustee or examiner has been appointed in this Chapter 11 Case.

3. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate their businesses and manage their properties as a debtor in possession.

4. On April 17, 2019, the Court entered a Notice of Deficient Filings and an Order Setting a Rule to Show Cause Hearing to address the Debtor's failure to retain counsel pre-petition.

5. On April 26, 2019, Jeffrey M. Carbino appeared on behalf of the Debtor and subsequently filed on May 7, 2019, an Amended Petition at the direction of the Bankruptcy Court to enter my appearance. [Docket No. 13].

6. The Debtor promptly filed its Schedules and Statements of Financial Affairs on May 21, 2019, [Docket No. 17]. A meeting of creditors was held and concluded by the United States Trustee on May 22, 2019. [Docket No. 18].

7. The Debtor's principal asset is located at 3036-3040 N. 22nd Street, Philadelphia, PA 19132 (the "Philadelphia Property"). As of the Petition Date, the Debtor was using its principal asset, a church which contains a sanctuary, office space and conference rooms on the first floor, a full basement, and twenty six (26) residential units on the second and third floor, for limited charitable purposes, including the distribution of food staples, meals and clothing to families in the immediate area and elsewhere, because the building's utilities had been terminated.

8. The Debtor filed a Motion Requiring its Utility Companies to Provide Utility Services and For Adequate Assurance (the "Utility Motion) [D.I. No. 16]. The Court entered an Order granting the Utility Motion on May 29, 2019, on an Interim Basis. [D.I. No. 25]. A hearing on the Final Order on the Utility Motion was scheduled for June 18, 2019. The Debtor filed a Certificate of No Objection to the Final Order on June 14, 2019 [D.I. No. 29]. A Final Order to approve the Utility Motion was entered by the Court on June 17, 2019 [D.I. No. 30]. Reinstating utility services to the Philadelphia Property was critical to the Debtor's ability to make necessary repairs to the Philadelphia Property and to reopen the twenty-six (26) residential units located therein.

9. Significantly more repairs were necessary than the Debtors initially anticipated to reopen the Philadelphia Property for the residents because frankly the Debtor had not correctly assessed the amount of work that was required; and unfortunately, the Philadelphia Property was vandalized during the period of time when the Debtor was making the repairs necessary so that the residential units could be occupied, operated and so that the Debtor could continue to provide charitable services within the Philadelphia Property and its environs.

10. The Debtor completed enough repairs and improvements to the Philadelphia Property prior to September 24, 2019, for the City of Philadelphia Licensing and Inspection to inspect the building and to issue a license authorizing the Debtor's use of the entire Philadelphia Property, including the Debtor's twenty-six (26) residential units. The labor and materials repairs completed through September 24, 2019, cost approximately **$75,000**. All of the **75,000** of repairs was funded by cash donations and/or donations of labor and materials.

11. On September 27, 2019, counsel for the Debtor filed a Certification of Counsel informing the Court and all the parties in interest that the Philadelphia Property had passed inspection and that the Debtor had obtained a Full Occupancy License. [Docket No. 43].

12. After the City of Philadelphia Licensing and Inspection issued that license, the local Office of Veterans' Affairs inspected the Philadelphia Property and requested that certain additional improvements be completed in the residential units. The work to complete the requested, additional improvements was completed. The Office of Veterans Administration inspected and approved the Philadelphia Property's residential units for occupancy on Monday, October 28, 2019.

13. The Debtor filed a Motion to Establish Deadline to File Proofs of Claim and Approving the Form and Manner of Notice Thereof on December 9, 2019. [Docket No. 52].

14. The Court entered an Order establishing January 25, 2020, as the Bar Date. [Docket No. 65].

15. A total of four proofs of claim were filed by the Bar Date:  (i) the City of Philadelphia's real estate tax claim in the amount of $64,705.95, (ii) Water Revenue Bureau of the City of Philadelphia's claim in the amount of $85.00, (iii) Water Revenue Bureau of the City of Philadelphia's claim in the amount of $83,796.75 and (iv) Philadelphia Gas Work's unsecured

claim in the amount of $2,139.62. The four (4) claims total $150,727.32. The Debtor is in the process of preparing and filing objections to the three (3) secured (liened) claims asserted by the City.

16. The Debtor anticipated that it would be providing housing immediately to a substantial number of veterans at rental rates consistent with the Debtor's income projections. Unfortunately, the Debtor experienced a number of setbacks: (i) the entire heating system in the building had to be replaced and other additional repairs became necessary in October and November 2019 and, as a result; (ii) the Debtor was unable to commence housing tenants until late November 2019; and (iii) the Debtor was not as successful as anticipated in renting its residential units. Among other problems experienced by the Debtor, two veterans signed leases for rooms but died before they moved into the Philadelphia Property. The Debtor also did not accurately anticipate the amount of time that would be required to fully rent its twenty-six (26) rooms to veterans and others.

17. As of January 30, 2020, the Debtor had 10 or 11 tenants occupying its residential units and continues to vet new potential tenants; the Debtor anticipated having forty (40) residential tenants or more within the next several months. The Debtor also had two tenants that rent the sanctuary in the Philadelphia Property for Sunday church services. Additionally, an affiliate of the Debtor had launched a radio station in January, WVRF.com, which station's rent for space in the Philadelphia Property was $900 per month plus $180 for utilities.

18. The Debtor has been able to make its post-petition payments to all its creditors through charitable donations and rental income from the church's sanctuary and tenants. The Debtor has also filed all of its Monthly Operating Reports through December 2019. The Debtor has not filed its Monthly Operating Reports for January, February and March 2020 initially

because the Debtor was prioritizing increasing the number of residential tenants in the Philadelphia Property prior to the hearing on the Debtor's Motion for an Order Extending the Date by Which the Debtor Must File and Confirm a Chapter 11 Plan Pursuant to Sections 105, 1121(e)(3) and 1129(e) of the Bankruptcy Code (the "Initial Extension Motion"). [D.I. No. 73]. Soon after the hearing on the Initial Extension Motion, the Debtor's CEO became ill with the flu and other health issues, as discussed below, that has made her unavailable to assist in the preparation and filing of the unfiled monthly operating reports.

19. On February 10, 2020, the Debtor filed a Disclosure Statement and Plan of Reorganization attached thereto (the "Plan"). [D.I. No. 75].

20. As of February 13, 2020, the Debtor had been continuing to make improvements to its Philadelphia Property and market its residential units to veterans and others. At the same time, the Debtor was developing a number of other complementary sources of income to fund a Chapter 11 plan and provide assistance to veterans and others and its charitable services within the Philadelphia Property and its environs.

21. Between January 30, 2020 and February 13, 2020, the Debtor increased the number of residential tenants in the Philadelphia Property from 10 or 11 to 18 residential tenants (at that time the Debtor was vetting new tenants on a regular, if not daily, basis).

22. On February 13, 2020, the Court conducted a hearing to consider the Initial Extension Motion over the City of Philadelphia's objection. At the hearing, the Debtor presented a Rental Log for February 2020 which (i) identified all of the tenants, residential or otherwise, **that would be paying rent during the month of February**. The Rental Log also identified five additional tenants that were being processed by the Veteran's Administration's Coatsville's

office for tenancy as soon as March 2020. A copy of the Rental Log for February 2020 is attached as Exhibit "A."

23.     The projected collections of rent from for February 2020 existing tenants was $12,855.00. The rent for the five new tenants being processed by the Veteran's Administration's Coatsville's office was as additional $4,250.00. **Accordingly, the Debtor believed that collections of rent in March 2020 would total, at least, $16, 255** ($12,855.00 + $4,250.00 = $17,105; provided however, that one of the new veteran tenants needed a ramp to access the Philadelphia Property. That ramp was being paid for and installed by the Veteran's Administration but there was no guarantee on February 13,2020, that the ramp could be installed by March. The Debtor advised the Court at the last hearing of the timing issue regarding the ramp.

24.     **All of the Debtor's calculations of rent for March have been rendered completely inaccurate as a result of COVID 19.** Three existing tenants are now hospitalized with COVID in a Veteran's Administration's hospital. At least three other tenants have moved out of the Philadelphia Property to live with family members to avoid exposure to COVID. One tenant left the Philadelphia Property because she was not paying her rent. As a result, the Debtor's tenant count was reduced to ten or eleven tenants once again. Additionally, each of the churches that were conducting Sunday services discontinued those services due to COVID at or about the end of February 2020, resulting in the loss of that monthly income.

25.     On a positive note, the Veteran's Administration's Coatsville's office has processed four new tenants for April occupancy. Checks were received by the Debtor for two of the new veteran tenants as of this date. The Debtor anticipates receiving checks for the other two new veteran tenants within the next several days presumably on a prorated basis.

26. Notwithstanding the reduction of rental income, the Debtor is paying all of its vendors and utility companies on a current basis. But that is the only good news.

27. As set forth below prior to February 2020, the Debtor reconstituted its board and appointed new officers to conduct the Debtor's daily operations in order to allow Earnestine Brown, the Debtor's CEO, to focus her attention on working to identify new tenants through the Veteran's Administration and otherwise and to buildout the other sources of income of the Debtor's affiliates (discussed below) to subsidize the Debtor's ongoing charitable purposes and to fund the Debtor's Plan and professional fees.

28. With the outbreak of COVID 19, the Debtor lost 3 of 4 of the newly appointed officers that were to free up the Debtor's CEO's time: (i) Anne Houston Rogers left Philadelphia because of her existing health conditions; (ii) Janice Cottom-Myers left the Philadelphia Property due to a pulmonary condition; and (iii) Helena Robeson left the Philadelphia Property due to a preexisting health condition.

29. The only newly appointed officer remaining is Margaret Coleman who previously was in charge of food and nutrition. At this point in time, Ms. Coleman is "managing" the Philadelphia Property. She is assisted by one maintenance man on a daily basis.

30. The Debtor is not taking on any new tenants during the COVID 19 pandemic because (i) there is no one available to properly vet potential new tenants; (ii) the Veteran's Administration does not have sufficient resources to assist the Debtor at this time; (iii) the Debtor already has approximately 14 to 16 people, including Ms. Coleman and the maintenance man, in a three story building every day; and most significantly (iv) the Debtor cannot test prospective tenants for COVID 19.

1" = "1" "5218225v1" "" 5218225v1

31. While the residential tenants are still being fed two or three times a day through other charitable entities and Ms. Coleman's efforts the residential tenants are sharing two large bathrooms on each of the second and third floor of the building.

32. The Debtor cannot take the chance of allowing additional tenants that are not properly vetted and tested for COVID 19 to reside in the building and potentially expose the other residents to the COVID 19 virus and the concomitant liability that could arise from the Debtor's decision to allow additional, improperly vetted and untested tenants.

33. If the loss of three of the Debtor's newly appointed officers was not enough, the Debtor's CEO, Earnestine Brown has not been inside the Philadelphia Property since the last week of February. Ms. Brown is under the treatment of her primary care physician and a pulmonologist. She is being treated for influenza, related breathing issues and high blood pressure resulting from all the medications for the treatment of her other health issues. She is self-quarantining in her home in Bear, Delaware with her significant other.

34. **As a direct result of the COVID 19 pandemic, the Debtor's Plan has become infeasible**

35. While the City of Philadelphia objected to the Initial Extension Motion, the Court directed Debtor's counsel to advise the Court if the Debtor's Plan became infeasible.

36. The City asserts a real estate tax claim in the amount of $64,705.95, (ii) the Water Revenue Bureau of the City of Philadelphia's asserts claims in the amounts of $85.00 and $83,796.75. Notably (i) the City's claims are in dispute and (ii) the City is not currently operating anything other than essential services. **Moreover, one week before the City of Philadelphia was ordered to shut down by the Governor Wolf and Mayor Kenney, an agent of the City's Office of Assessment had inspected the Debtor's Philadelphia Property in the**

ongoing, administrative process to determine whether to grant the Debtor's petition for tax exempt status *nunc pro tunc*. The Debtor determined that if it could obtain tax exempt status pursuant to administrative procedures it would be more efficient that litigating the issue in this Court or elsewhere.

37. The Debtor filed its Chapter 11 case to stop a sheriff's real estate tax sale **The Sheriff for the County of Philadelphia has postponed all of tax sales over the last several weeks for the reason that hundreds of individuals attend tax sales.** So long as the COVID 19 pandemic continues, it is reasonable to assume that even if the automatic stay was not in effect the City could not cause the Philadelphia Property to be sold at a Sheriff's real estate tax sale. Accordingly, the City should not be prejudiced by the relief sought pursuant to this Motion. Should the pandemic unexpectedly end sooner than the experts predict, the City could file an appropriate motion. So long as the Debtor has enough time to obtain the income projected on the Rental Log by March, the Debtor's Plan should become feasible.

### THE DEBTOR'S BUSINESS OPERATIONS AND PROPOSED DISTRIBUTIONS UNDER A CHAPTER 11 PLAN OF REORGANIZATION

38. As of the Petition Date, the Debtor had limited operations in the Philadelphia Property and a generally inactive Board of Directors. Earnestine Brown was trying to continue the ongoing charitable services still being provided by the Debtor and Ms. Brown continued through early of January 2020 to bear the overwhelming burden of overseeing the Debtor's operations and reorganization with the limited assistance of a few volunteers. As of January, the remaining Board members met and established a newly constituted Board of Directors and newly-appointed officers to oversee the daily operations of the Debtor:

| Board Member Name | Title |
|---|---|
|  |  |

| Dr. Kim Warfield-Walker | Chairman |
| --- | --- |
| Earnestine O. Brown | Director Emeritus and CEO |
| Anne Houston Rogers | Director |
| Darryl James | Vice President |
| Janice Cottom-Myers | Secretary |
| Kevin Morrison | Vice Chair |
| Margaret Coleman | Chaplain |
| Janice Hollis | Treasurer |

Also, please see below the members of daily operation for the ministry:

| Name – Daily Operations | Title / Role |
| --- | --- |
| Anne Houston Rogers | President |
| Janice Cottom-Myers | Chief Operations |
| Helena Robeson | Secretary/Intake |
| Margaret Coleman | Food & Nutrition |

39.     With a new board and new individuals assuming responsibility for the daily operations of the Philadelphia Property, Ms. Brown would have had availability to supervise the development of the new revenue streams enumerated below.

40.     On or about January 20, 2020, an affiliate of the Debtor, Veterans Reset Coalition, went online with a new radio station, WVRFradio.com, based in the Philadelphia Property. The Debtor and its affiliate are working with Dr. Janice Hollis of Hollis Media Group to promote the radio station. Because the Debtor's affiliate is currently operating the radio station without any employee expense, the radio station should start producing a significant amount of income for the Debtor in the short term. The radio station is operational and has invoiced various clients including All Dunn Advertising and "Do Something Positive" both committing to

11

advertising and program placement on WVRF radio 3 days per week commencing on February 10, 2010. Dr. Hollis had projected that the Debtor's radio station could generate, at least, $293,120.00 on an annualized basis. A number of individuals have already begun making subscriptions to support WVRF Radio.

41.     Prior to the COVID 19 pandemic, he Debtor was providing space for a program known as "A More Excellent Way" (the "Program"). The purpose of the Program is to provide support and treatment for individuals suffering from substance abuse and other afflictions who are unemployed, on the street or may have been incarcerated. Through the Program, clients were being, and post-COVID 19 will be going forward, taught life skills towards the goal of helping them learn to function independently in society. The Debtor anticipates that a number of the Program's clients will ultimately become tenants in its residential units, and accordingly, supplement the Debtor's rental income. The Program's director, Kathu Dixon suffers from pulmonary issues and, for that reason, is not operating the Program until the COVID 19 pandemic is no longer a threat to every individual.

42.     The Debtor is establishing an outpatient drug recovery program in the Philadelphia Property. Initially, the Debtor was approached by a nascent business, Exodus Recovery, that wanted to lease space in the Debtor's facility to operate an outpatient substance abuse and drug recovery program. During negotiations, the Debtor determined that while Exodus Recovery did have three properly-trained and certified peer counselors, Exodus Recovery did not have required the required licensing, insurance or ability to obtain reimbursement from insurance companies, Medicaid or Medicare. Accordingly, the Debtor was working with the certified, peer counselors from Exodus Recovery to establish its own in-house, outpatient drug recovery program because (i) the Debtor has the required licensing, insurance

12

and ability to obtain reimbursement from insurance companies, Medicaid and Medicare and (ii) an outpatient drug recovery program would create additional income for the Debtor and constitute a complementary service to the Debtor's other services.

43. Mako Medical Laboratories of Raleigh, North Carolina has agreed to support the Debtor's outpatient substance abuse and drug recovery program by donating drug testing and certain psychological services. The Debtor will actively attempt to establish an outpatient drug recovery program after the COVID 19 pandemic no longer poses a threat to every individual.

44. The Debtor is also in the process of establishing a home healthcare nursing agency through an affiliated entity, PKR Staffers, to generate additional revenue to fund a Chapter 11 plan and to continue its ongoing charitable services in the Philadelphia Property and its environs. PKR Staffers is about to be licensed by the State of Delaware and has identified nurses that have agreed to manage and run the home healthcare nursing agency post COVID 19.

45. Finally, the Debtor was working with Jevs Human Services to establish a school to help veterans and others with reentry into the work place. Jevs Human Services provides job search and placement help, access to job training and education, referrals to housing, health care and legal services in various communities. Post COVID 19, the Debtor is very well-positioned to provide a classroom atmosphere and temporary or longer housing to the mutual benefit of the students and the Debtor. The Debtor anticipates having the Jevs school operational after the COVID 19 no longer poses a threat to every individual.

46. The Debtor believes that within a few months post Covid 19 it will generate enough positive cashflow from rentals, its radio station, its drug rehabilitation programs and its home healthcare nursing agency to pay one hundred percent (100%) of the "allowed amount" of

the City of Philadelphia's three (3) asserted claims over a period of two (2) years to five (5) years (or less) plus interest in the amount of nine percent (9%).

## RELIEF REQUESTED

47. By this Motion, the Debtor is seeking a continuance of the confirmation hearing on the Debtor's Chapter 11 Plan until a date in October 2020.

48. In a small business case, Section 1121(e)(1) of the Bankruptcy Code provides an initial period of one hundred eighty (180) days after the commencement of a chapter 11 case during which the Debtor has the exclusive right to file a chapter 11 plan. The plan and disclosure statement (if any) shall be filed not later than 300 days after the order for relief. 11 U.S.C. § 1121(e)(2). Nevertheless, "the time periods specified in paragraphs (1) and (2) may be extended [] if:

> (A) the debtor, after providing notice to parties in interest (including the United States trustee), demonstrates by a preponderance of the evidence that it is more likely than not that the court will confirm a plan within a reasonable period of time;
>
> (B) a new deadline is imposed at the time the extension is granted; and
>
> (C) the order extending time is signed before the existing deadline has expired."

11 U.S.C. § 1121(e)(3).

49. Where the statutory periods prove to be unfeasible timeframes, section 1121(e)(3) of the Bankruptcy Code allows the Court to extend the deadlines by which the debtor must file a plan and solicit acceptances thereof if "the debtor, after providing notice to the p[arties in interest (including the United States Trustee), demonstrates by a preponderance of the evidence

1" = "1" "5218225v1" "" 5218225v1

that is more likely than not that the court will confirm a plan within a reasonable period of time." 11 U.S.C. § 1121(e)(3)(A).

50. Although the Bankruptcy Code does not define the length of "a reasonable period of time" for purposes of an extension under section 1121(e)(3), the Debtor had made significant progress during the last several months and will post-COVID continue to make good faith progress toward reorganization.

51. **The Debtor is paying its bills as they become due**.

52. As explained above, the Debtor believes that it will be able to show by a preponderance of the evidence that is more likely than not that the Court will confirm its Plan within "a reasonable period of time" after the COVID 19 pandemic no longer poses a threat every individual.

53. The Debtor has been operating under the protection of chapter 11 for approximately twelve (12) months, and during this period of time has made significant and material progress in administering the Chapter 11 Case. The Debtor expended, at least, $75,000 to renovate the Philadelphia Property that had been without utility services for an extensive period of time prior to the Petition Date. The Debtor has established the new revenue streams described above during that same period of time with only volunteer assistance and donations.

54. In order to confirm a Chapter 11 plan that provides for payment of creditors over a number of years, the Debtor needs the opportunity to establish a baseline of revenue so that projections can be included in its plan and feasibility established. While the Debtor has filed a Plan, the Debtor is seeking a continuance of the now-scheduled April 21, 2020 confirmation hearing to a date in October 2020.

55. Importantly, the Debtor is not seeking an extension to delay administration of this Chapter 11 Case or to exert pressure on its creditors, but rather to resolve issues related to any potential plan and continue the orderly, efficient, and cost-effective chapter 11 process. In our lifetimes, none of us has experienced a pandemic of this ferocity. The Spanish flu a/k/a the 1918 flu pandemic occurred over 100 years ago and lasted from January 1918 to December 1920. The Debtor finds itself in a very difficult, if not impossible, situation. While the City made a reasonable written argument opposing the Initial Extension Motion, the facts and circumstances have tragically changed.

56. The Debtor understands that this Court believed on February 13, 2020 that if the Debtor's plan was feasible, the Debtor, as a small business debtor, and its counsel was obligated to move forward promptly to confirmation of the Debtor's Plan. **The Debtor's plan has become infeasible for a reason completely outside of the Debtor's control.**

57. The COVID 19 pandemic has tragically changed the circumstances. "Circumstances outside the control of the debtor and counsel can, as is happening in this case, make adherence to [] unextended deadlines extremely difficult or even impossible." *In re AMAP Sales & Collision, Inc.*, 403 B.R. 244, 247 (Bankr. E.D.N.Y. 2009). So long as the COVID 19 pandemic exists, the Debtor cannot confirm its Plan and the value and income potential of the Philadelphia Property will likely decrease.

58. Based on the foregoing, the Debtor respectfully submits that it is more likely than not that the court will confirm a plan within a reasonable period of time within the meaning of 11 U.S.C. § 1121(e)(3)(A); and accordingly, the Debtor requests an extension of six months of the scheduled hearing on confirmation of the Debtor's Plan or such other period of time as the Court deems appropriate. The Debtor reserves the right to seek an additional continuanc if a

reasonable period of time has not elapsed after the COVID 19 pandemic has ended so that the Debtor will have sufficient time to establish a baseline of revenue and that projections can be included in its Plan and feasibility established.

## NOTICE

59. Notice of this Motion will be given to: (i) the U.S. Trustee; and (ii) all parties entitled to notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, under the circumstances, no other or further notice is required.

## NO PRIOR REQUEST

60. No prior request for the specific relief sought in this Motion has been made to this or any other Court.

WHEREFORE, for the reasons stated herein, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto, pursuant to sections 105, 1121(e)(3) and 1129(e) of the Bankruptcy Code granting the relief requested in the Motion and such other and further relief as the Court deems just and proper.

Dated: April 7, 2020　　MONTGOMERY MCCRACKEN WALKER &
Wilmington, Delaware　　RHOADS, LLP

　　　　　　　　　　　　/s/ *Jeffrey M. Carbino*
　　　　　　　　　　　Jeffrey M. Carbino (DE Bar No. 4062)
　　　　　　　　　　　1105 North Market Street
　　　　　　　　　　　Wilmington, DE 19801
　　　　　　　　　　　Telephone: (302) 504-7800
　　　　　　　　　　　Telephone (215) 234-3333
　　　　　　　　　　　Email: jcarbino@mmwr.com

　　　　　　　　　　　*Counsel for the Debtor and*
　　　　　　　　　　　*Debtor in Possession*

1" = "1" "5218225v1" "" 5218225v1